Filed 2/15/22  Young v. Le CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BRIDGET M. YOUNG et al.,<br><br>　　Plaintiffs and Respondents,<br><br>　　v.<br><br>TRAM BAO LE,<br><br>　　Defendant and Appellant;<br><br><br>REZA SADEGHI,<br><br>　　Intervenor and Respondent. | D078208<br><br><br>(Super. Ct. No. 37-2020-00015489-CU-OR-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Dicks & Workman, Joseph G. Dicks, Linda G. Workman; Niddrie Addams Fuller Singh and John S. Addams for Defendant and Appellant.

Taylor Anderson and Christopher R. Mordy for Plaintiffs and Respondents.

Reza Sadeghi, in pro. per., for Intervenor and Respondent.

## INTRODUCTION

Defendant Tram Bao Le appeals from an order of the trial court denying her motion to dissolve a preliminary injunction prohibiting Le and "anyone else acting on behalf of [Le] . . . from performing any construction work" on Le's home.

The plaintiffs Bridget and Wayne Young (the plaintiffs) live across the street from Le. They filed this action after Le proceeded with construction on a remodel of her home after her remodel plans were rejected by an architectural committee tasked with considering and approving any proposed construction on properties in the planned community in which the parties live (the Architectural Committee or Committee).[1] Shortly after filing the action against Le, the plaintiffs sought a preliminary injunction to prohibit Le from continuing construction on her home. The trial court weighed the parties' arguments and evidence and ultimately enjoined Le from continuing with further construction while the lawsuit proceeded.

Approximately two months after the trial court issued the preliminary injunction, Le filed a motion to dissolve the preliminary injunction pursuant to Code of Civil Procedure section 533 (section 533). That provision grants a court discretion to modify or dissolve an injunction or temporary restraining order when a party makes a showing that there has been "a material change in the facts upon which the injunction" was granted, the law has changed, or there has been a showing that the "ends of justice would be served" by such an order. (§ 533.) Le asserted that throughout the review of her proposed

---

[1] According to the plaintiffs, Le's proposed remodel will negatively impact the views from their property and will therefore negatively affect the value of their property.

plans by the committee, she was led to believe that there was only a single voting member of the Architectural Committee, but that during litigation of this action, she discovered that a second voting member had been elected to the Committee. According to Le, this member had never resigned or been removed from the Architectural Committee, despite having sold her home in the community and having moved. Le contended that because there were two members of the Committee, the denial of approval of her remodel plans by a single member of the Committee was not a valid act, and that the denial was therefore ineffective. On the basis of these "new" facts, Le asserted, the preliminary injunction should be dissolved.

The trial court found that the second member of the Architectural Committee had sold her home and moved, that she was no longer a member of the community association that the Committee represented, and that she had "effectively resigned" from her position. Based on these findings, the court concluded that there had been no material change in the facts from the time the court issued the preliminary injunction and denied Le's motion to dissolve the preliminary injunction.

On appeal, Le contends that the trial court abused its discretion in denying her motion to dissolve the preliminary injunction. She argues that the CC&Rs render the recording of the second Architectural Committee member's election to the Committee "conclusive and binding," and that because this second member was never formally removed from the Committee pursuant to the terms of the CC&Rs, and did not formally resign from her position or otherwise notify the homeowners of her resignation, this member remained a voting member at the time Le's plans were being considered. Le maintains that, as a result, the Architectural Committee's denial of approval of Le's plans was invalid because the vote of the single

3

member of the Committee did not constitute the required "majority" of the Committee's votes and/or there was not a quorum at the meeting at which approval of Le's plans was denied.

We conclude that the trial court's finding that one of the two elected committee members of the Architectural Committee effectively resigned is supported by substantial evidence, and that the court did not abuse its discretion in denying Le's motion to dissolve the preliminary injunction. We therefore affirm the trial court's order denying Le's section 533 motion.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *The relevant Declaration of Restrictions*

The parties live in La Jolla Corona Estates No. 2 (Corona Estates No. 2), a planned community of homes located in La Jolla, California. The community is subject to the restrictions provided for in a set of recorded CC&Rs that run with the land.

Among the relevant restrictions in the CC&Rs is "Restriction No. 4," which states: "No buildings shall be erected on any of said lots until the complete plans and specifications for such building and the location thereof, together with the landscape plan, and a grading plan, if a grading plan is requested, have been approved by [the Architectural] Committee . . . ." "Restriction No. 4" further indicates that "no structure or building of more than one story in height shall be erected without the prior approval of said Committee."

The CC&Rs provide for the creation and existence of the Architectural Committee that is tasked with approving any proposed construction on the lots that comprise Corona Estates No. 2. The Architectural Committee is to consist of "not more than three members, the majority of whom shall be

4

owners of the improved lots" that are subject to the CC&Rs.[2]  The CC&Rs do not require that the Architectural Committee have any minimum number of members.  With respect to the removal or replacement of members of the Architectural Committee, the CC&Rs provide:

> "Any member of such Committee may be removed, and a new member appointed or elected thereto, at any time by the party or parties authorized to appoint or elect said Committees, which such removal and appointment or election shall be disclosed by a written instrument executed and recorded in the manner above provided for in the appointment or election of such Committee, and shall become effective immediately upon such recordation.
>
> "Any substitution in or addition to such Committee shall likewise be evidenced by a written instrument, executed and recorded as provided above.
>
> "Any of said instruments so executed and recorded as provided above shall be conclusive evidence of the creation of any such Committee, of any addition or substitution in the membership thereof, of their authority to act as herein

---

[2]    The relevant language discussing the composition of the Architectural Committee provides:

> "Any such Committee elected by the owners of a majority of the improved lots and plots shall consist of not more than three members, a majority of whom shall be owners of improved lots and plots subject to these conditions and restrictions, and the fact of their election shall be conclusively established and disclosed by a written instrument setting forth the name and addresses of the members so elected, the period for which they are elected and the fact that they are the duly elected members of said Committee.  Said instrument shall be signed by the owners of a majority of the improved lots and plots whose ownership is disclosed by the Official Records of San Diego County."

provided, and of the facts therein set forth; and the written approval by any such Committee so designated shall be conclusive and binding on all parties having any rights under these restrictions."

The CC&Rs provide that "[a]ny act permitted to be done by any Committee hereunder may be done by a majority of the members of any such Committee."

B. *Factual background regarding membership of Architectural Committee during the time period in question*

In 2016, two owners of properties in Corona Estates No. 2, Lauri Frontera and Danielle Peay, were elected to the Architectural Committee. Mike Flood, who appears to be another property owner in Corona Estates No. 2, is identified in correspondence in the record as the "Administrator" of the Architectural Committee, but not as a member. In March 2016, Flood recorded a "Supplement to Declaration of Restrictions La Jolla Corona Estates, Unit No. 2," which identified Frontera and Peay as the members of the Architectural Committee elected by "[t]he owners of a majority of the improved lots and plots" in the community. This document also indicated that Frontera and Peay had each been elected to serve for a two-year period, with "automatic, successive extensions of one year, unless earlier terminated by resignation or by removal and replacement by vote of the owners of a majority of the improved lots, per the CC&R's."

In January 2020, Peay, sold her home and moved out of Corona Estates No. 2.[3] On January 19, 2020, Peay sent a text message to Flood and

---

[3] The parties disagree with respect to the factual determinations to be reached as a result of Peay's selling her home and her communications with the Architectural Committee and other Board representatives. Plaintiffs contend that the evidence demonstrates that Peay resigned from the

Frontera stating: "Hi- I am moving today and we have sold our house. Not sure what steps I should take re the AC . . . I've enjoyed volunteering with you both :)[.]" Flood responded with the following message:

> "THANK YOU for your service! No need to send a resignation letter right now. I'll initiate an election when I return on 1/26. Until then, any action taken (none expected) by the AC will show just Lauri voting. When we send out the Notice of Election and Request for Candidates we will say there are two vacancies on the Committee to be filled. Safe moving - and stay in touch!"

Frontera responded to Peay's text message, saying, "The selfless part of me says congrats on the house sale and good luck in the next adventures in your life! The selfish side of me is really bummed – you will be missed!" Flood wrote "Agreed!" and included an image of a famous character showing a sad facial expression. Peay stated, "You two are the best- Tha[nks] Again!"

It does not appear that an election was held to replace Peay or to install a new member in the previously unfilled third Architectural Committee position prior to the events leading to the filing of this action.

C.  *Le's proposed addition to her residence*

On the morning of February 5, 2020, Le and Hoang Nguyen[4] sent an e-mail to Flood inquiring about the need for approval by an architectural committee of plans for a remodel of Le's home. Le and Nguyen indicated that they had already received approval from the City of San Diego for their

---

Architectural Committee, leaving the Committee with a single remaining member. Defendant contends that because Peay never sent a formal resignation letter or otherwise provided formal notice to the homeowners, she never resigned and therefore, continued to serve as a voting member of the Architectural Committee during the relevant time period.

[4]      Nguyen is not a party to the action or this appeal.

remodel plans. The designer of the project sent a follow-up e-mail to Flood that same day. That evening, Frontera responded to Le and Nguyen's e-mail to provide a "summary overview" of the Architectural Committee process for reviewing and approving proposed remodel plans. Frontera did not identify Peay, or any other individual, as being a member of the Architectural Committee in this e-mail, but did present herself as a member of the Committee.

On March 10, 2020, Flood sent a letter by e-mail to Le, "per the direction of the Architectural Committee for La Jolla Corona Estate, Unit No. 2 in response to the submittal for review by the Committee of proposed construction made by the owner of lot 131 . . . ." The letter includes letterhead that reads as follows:

"Architectural Committee
"LA JOLLA CORONA ESTATES, UNIT NO. 2 (LOTS 66-224)
"Lauri Frontera Ratliff, Member - [Number] La Jolla
Rancho Road, [e-mail and telephone number]."

In this letter, the Committee stated that it "will not provide a positive determination at this time." However, the Committee further explained that it would provide Le "some time . . . to take concerns of your neighbors whose ocean views would be negatively impacted into account," and thus would not be "issu[ing] an outright negative determination." The Committee invited Le to "submit revised plans for consideration" if she chose to do so after "consulting with [her] neighbors." The Committee further stated that if Le did not indicate a desire to submit revised plans, "a negative determination will be made no later than March 17, 2020." The letter was "signed" by the "Architectural Committee [¶] La Jolla Corona Estates, Unit 2."

On March 17, 2020, the Architectural Committee sent Le a letter stating that because Le had not communicated her intention to modify the

8

plans for the proposed construction on her home, the Committee was "making a negative determination with regard to [Le's] submission." This letter was also signed by the "Architectural Committee [¶] La Jolla Corona Estates, Unit 2." The letter included the same letterhead as the previous letter—i.e., the letterhead that identified Frontera as the sole member of the Architectural Committee, and provided her contact information.

It appears from the record that Le began construction on her residence despite the "negative determination" by the Architectural Committee. The plaintiffs retained an attorney, who filed the underlying action on their behalf. On April 20, 2020, the plaintiffs' attorney sent a letter to Le, through Le's attorney, requesting that Le stop the construction on her home. Copies of the summons and complaint in the underlying action were included with the letter. In further communication between the attorneys, the attorney for the plaintiffs again requested that Le halt further construction. The record demonstrates that the parties failed to reach an informal resolution of the matter.

D.  *The trial court proceedings*

The plaintiffs filed their action against Le on May 26, 2020, seeking declaratory and injunctive relief arising from allegations of Le's breach of the CC&Rs.

Approximately a week later, the plaintiffs moved for a temporary restraining order and requested that a preliminary injunction be issued. The trial court granted the motion for a temporary restraining order and set a hearing on the request for a preliminary injunction.

After a hearing, on June 24, 2020, the trial court entered an order granting the plaintiffs' request for a preliminary injunction. The trial court determined that the plaintiffs had established a substantial likelihood of

9

success on the merits of their claim. The trial court noted that, although the CC&Rs stated that the Architectural Committee could not "exceed three homeowners," they did not "specify a minimum number" of members. The court further noted that at the time Le's plans were considered by the Architectural Committee, only Frontera "was available" to vote on Le's application. The court concluded that, given the lack of a requirement of a minimum number of members of the Architectural Committee, and given that a dictionary definition of the term "committee" allows for membership of a single person delegated to complete a specific task, it was permissible for Frontera, alone, to have acted on behalf of the Architectural Committee.

The trial court further concluded that because this action involves real estate, money would be insufficient to compensate plaintiffs for Le's violation of the CC&Rs, and even if money would be sufficient, it would be difficult to determine the value of the harm caused by Le's conduct. The court ultimately determined that the issuance of an injunction prohibiting Le from undertaking any further construction at her home was appropriate, although the court did not require that Le remove "that portion of construction that has already taken place." The court required that the plaintiffs post an undertaking in the amount of $175,000 to cover any damages that Le might suffer in the event that it were ultimately determined that the injunction was improvidently granted.

Le originally appealed from the trial court's order granting the preliminary injunction. However, approximately three months after filing

the notice of appeal from the court's order granting the plaintiffs' request for a preliminary injunction, Le moved to dismiss the appeal.[5]

In the interim, Le filed a motion in the trial court to dissolve the preliminary injunction pursuant to section 533. Le's motion indicated that she believed that there were "[n]ew, [a]ctual [f]acts" that were different from the facts that had been alleged by the plaintiffs in the papers supporting their request for a preliminary injunction. Among the "new" facts that Le asserted supported the dissolving of the preliminary injunction was that "[a]t all relevant times, there were two members of the [fn. omitted]" Architectural Committee, and that the plaintiffs and the Architectural Committee had "withheld" from Le the fact that Peay "was still a member of the AC as she was never removed and had never resigned therefrom." Thus, Le argued, when Frontera acted on behalf of the Architectural Committee, she acted in the absence of the necessary quorum and/or her vote did not constitute a majority of the Committee's votes. In either case, Le argued, Frontera's act of denying approval of Le's plans was invalid.

After full briefing, the trial court denied Le's motion to dissolve the injunction, finding that Peay had "sold her home and moved out of the community." The court further found that Peay was "no longer a member of the [Corona Estate No. 2] Association, she could not serve on the

---

5      We grant Le's unopposed request for judicial notice, in which Le seeks judicial notice of (1) the dismissal request she filed in the appeal in case No. D077672, as well as this court's order dismissing the appeal in that matter and subsequent remittitur, and (2) a stipulation and proposed order submitted to the trial court on October 15, 2020, to permit Le to file a brief in support of her motion for dissolution of the preliminary injunction, notwithstanding its page length, which would otherwise violate California Rules of Court, rule 3.113(d) and (g).

Architectural Committee, and effectively resigned." The court indicated that because it had previously taken into consideration the fact that only one of the two elected members remained on the Architectural Committee at the time of the relevant events, there had not been a change in the facts upon which the court had granted the preliminary injunction, and therefore, there was no basis for dissolving the injunction.

Le filed a timely notice of appeal from the trial court's order denying her motion to dissolve the preliminary injunction.[6]

## III.

## DISCUSSION

Le asserts that the trial court abused its discretion in denying her motion to dissolve the preliminary injunction because (1) there was a material change in the facts upon which the injunction was granted and/or (2) the "ends of justice would be served by" (§ 533) dissolving the injunction. We conclude that neither argument has merit.

A.  *Legal standards*

Section 533 provides that "[i]n any action, the court may on notice modify or dissolve an injunction or temporary restraining order upon a showing [(1)] that there has been a material change in the facts upon which the injunction or temporary restraining order was granted, [(2)] that the law

---

[6]     After full briefing on appeal, Le filed an unopposed motion to augment the record pursuant to California Rules of Court, rule 8.155(a), to include in the record on appeal documents comprising the exhibits attached to Notices of Lodgment and Requests for Judicial Notice filed in the trial court in connection with Le's opposition to the plaintiff's motion for a preliminary injunction, and those filed in connection with Le's motion to dissolve the preliminary injunction.  We grant the motion.  The record shall be augmented with the documents attached to Le's motion.

upon which the injunction or temporary restraining order was granted has changed, or [(3)] that the ends of justice would be served by the modification or dissolution of the injunction or temporary restraining order."

We review the trial court's order denying a motion to dissolve an injunction for an abuse of discretion. (*Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1505 (*Loeffler*); *People ex rel. Feuer v. Progressive Horizon, Inc.* (2016) 248 Cal.App.4th 533, 540.) A trial court's decision not to dissolve an injunction " ' " 'rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case.' " ' " (*People v. Brewer* (2015) 235 Cal.App.4th 122, 136 (*Brewer*).)

"The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711.) To the extent that the issues raised on appeal from an order denying a motion to dissolve an injunction require us to review the trial court's factual findings, we apply the substantial evidence standard of review. (*Loeffler, supra*, 174 Cal.App.4th at p. 1505.) In addition, "[w]e presume that the trial court['s] order is correct, and imply findings that are necessary to support" the order. (*Estate of O'Connor* (2017) 16 Cal.App.5th 159, 169; see *Brewer v. Carter* (2013) 218 Cal.App.4th 1312, 1320 ["[u]nder the doctrine of 'implied findings,' if the record is silent, we must presume the trial court fully discharged its duty to consider all of the relevant factors and made all of the factual findings necessary to support its decision for which there is substantial evidence"].) Further, although the trial court's denial of a request to dissolve an injunction " ' " 'rests in the sound discretion of the trial court' " ' " (*Brewer, supra*, 235 Cal.App.4th at p. 136), to the extent that the denial is based on the trial court's determination of a legal question, the

reviewing court conducts an independent review, without deference to the trial court's conclusion. (See *Haraguchi, supra*, at p. 712 [conclusions of law are reviewed de novo]; see also *Eneaji v. Ubboe* (2014) 229 Cal.App.4th 1457, 1463 ["whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law"].)

B. *The trial court did not abuse its discretion in concluding that there had not been a material change in the facts upon which the court issued the preliminary injunction*

Le argues that "new facts" came to light after the trial court issued the preliminary injunction, and that these new facts demonstrated why the preliminary injunction should not have been issued. As discussed above, Le contends that, at the time Le's plans were being considered, the Architectural Committee consisted of two members, not one. Le maintains that Peay remained an elected member of the Architectural Committee during the relevant time period because she never formally resigned and was not removed under the procedure set forth in the CC&Rs, and that the Architectural Committee's denial of Le's plans was invalid because only a single member of the Architectural Committee voted to deny approval of Le's plans.[7] Le contends that the vote "fail[ed] for lack of a quorum," and/or failed

---

[7] Le contends that the CC&Rs permit a person who is not a homeowner in Corona Estates No. 2 to serve on the Architectural Committee, noting that the CC&Rs state that "[a]ny such Committee elected by the owners of a majority of the improved lots and plots shall consist of not more than three members, *a majority of whom shall be owners of improved lots and plots* subject to these conditions and restrictions." Because this provision indicates that at least one member of the Committee need not be a homeowner, Le's position is that the fact that Peay sold her home did not automatically render her ineligible to remain on the Architectural Committee, even though Peay, Frontera, and Flood all appeared to believe that Peay's selling of her home meant that she was ineligible to continue serving as a voting member. As we

because the CC&Rs require that the Architectural Committee act through a majority of its members, and the vote of a single member is not a "majority" where there are two members.[8] According to Le, because there was a written, recorded instrument identifying Peay as a member of the Architectural Committee, and because, Le contends, Peay "never resigned from the AC, was told not to resign from the AC, was never asked for her resignation, and was never removed by any action by the owners, majority or otherwise," this "le[ft] intact the conclusive nature of" the recorded document demonstrating that Peay was elected to be a member of the Architectural Committee.

The trial court concluded that the evidence demonstrated that Peay was "no longer a member of the Association" and that she had "effectively resigned" from the Association's Architectural Committee after she "sold her home and moved out of the community." This finding undermines Le's position. The court further concluded that, at the time the Architectural Committee denied Le's plans, there was a single elected member who comprised the Architectural Committee, and that the vote of a single member was sufficient because the CC&Rs did not require a minimum number of

explain further, even if we presume that Le's interpretation of the CC&Rs is correct, and that Peay's selling of her home did not automatically render her ineligible to continue serving on the Committee, the trial court found that Peay effectively resigned from her position, and that finding is supported by the evidence.

[8] For example, in her briefing on appeal, Le asserts that the "New, Actual Facts" that she presented in the trial court included the "facts" that "[a]t all relevant times, there were two members on the La Jolla Corona Estates Unit No. 2 AC" (fn. omitted), and that ". . . Danielle Peay was still a member of the AC as she was never removed and had never resigned therefrom."

members.  The court noted that when the court initially ruled, it had "t[aken] into consideration that one of the two elected members of the Architectural Committee (Danielle Peay) had sold her home and moved out of the community."  Based on these findings, the court concluded that there had been no material change in the facts from the time the court initially ruled on the motion for a preliminary injunction.

Our review of the record demonstrates that there is substantial evidence to support the trial court's determination that Peay resigned from the Architectural Committee, leaving it with a single member at the time Le's plans were considered and denied.

We begin by noting that there is no requirement in the CC&Rs as to what a member must do in order to resign from his or her duties on the Architectural Committee.  There is no indication that any particular formalities must be followed to effectuate an Architectural Committee member's resignation.  We therefore agree with the trial court that it is a factual question as to whether Peay's actions and communications provided a clear indication that she no longer intended to serve on the Architectural Committee.  The evidence supports the trial court's determination that Peay provided a sufficiently clear message that she no longer intended to serve on the Architectural Committee, such that she effectively resigned from the Committee.  On January 19, 2020, Peay sent a text message to Flood, the Architectural Committee administrator, as well as to Frontera, the other Architectural Committee member, in which she stated:  "Hi- I am moving today and we have sold our house.  Not sure what steps I should take re the AC . . . I've enjoyed volunteering with you both :)[.]"

The communications between Peay, Frontera and Flood indicate that both Frontera and Flood understood that Peay was tendering her resignation

16

through this communication. Flood said, "THANK YOU for your service!" and then indicated that until there was a new election initiated, "any action taken . . . by the AC will show just Lauri voting." Frontera also indicated that she understood that Peay was giving up her position on the Architectural Committee at that point in time, stating, "[Y]ou will be missed!"

In a deposition taken in this case, Peay confirmed that her text communication with Frontera and Flood was intended to convey that she was giving up her position on the Architectural Committee:

> "Q.    So in the text message that you sent on Sunday, January 19th, 2020, as I read it, the one sentence that counsel [for Le] didn't read to you is: 'I've enjoyed volunteering with' both of you. And you said that in the past tense; right? 'I've enjoyed.'
>
> "A.    Yes.
>
> "Q.    All right. And is that because it was your intention that you were no longer going to be volunteering on the architectural committee?
>
> "[¶] . . . [¶]
>
> "THE WITNESS: Yes.
>
> "[¶] . . . [¶]
>
> "Q.    Was it your intention that you were never going to be serving on the architectural committee?
>
> "[¶] . . . [¶]
>
> "THE WITNESS: That I was never going to be? I'm sorry. I couldn't hear you. That I was never going to be — again, I was never going to again serve on the architectural committee?

"MR. MORDY: Right.

"THE WITNESS: Yeah. Yeah. That's right.

"BY MR. MORDY: [¶] Q. Okay. Why did you use the past tense, 'I've enjoyed volunteering'?

"A.     Because I was done volunteering.

"Q.     You — in your text — in your — in your testimony today, you used the words, 'I'm done. I'm out. Bye.' Do you recall that?

"A.     That sounds about right.

"Q.     Yep. [¶] And was that your intention, when you sent this text message, to say something to that effect?

"A.     Yes.

"[¶] . . . [¶]

"Q.     Was it your intention, when you sent this, even if you didn't use the word 'resign,' *was it your intention to say that you were resigning from the architectural committee*?

"A.     *Yeah.* And I'm not trying to be vague when I answer your guys' questions on this topic —

"Q.     Sure.

"A.     — I just really thought I didn't have to resign, because since I didn't own a property, that I could no longer be on it. I thought it was like a de facto, you know, I'm done.

"[¶] . . . [¶]

18

"Q.      Okay.  *But it was your intention, at this point, that you were no longer going to be volunteering on the architectural committee; is that right?*"

"A.      *Yes, it was.  Yeah.*" (Italics added.)

Peay's testimony thus supports the trial court's finding that Peay intended to resign from the Architectural Committee when she sent the text message stating that she had "enjoyed" serving on the committee; the clear implication of her words was that she would no longer serve on the committee.  The fact that Peay also stated that she "thought [she] didn't have to resign" does not undermine the trial court's finding that she effectively resigned, because the clear import of her words was that she did not believe that she had to do anything *more* to communicate her resignation.  As the trial court concluded, Peay did not have to do anything more; her communications with Frontera and Flood were sufficient to effect her resignation from the Committee.  The fact that Peay believed that her resignation from the Architectural Committee would occur automatically as a result of the fact that she had sold her home and was moving out of the community does not undercut the trial court's finding; despite her belief, Peay nevertheless communicated her intention to give up her position on the Architectural Committee and conducted herself consistent with that intention.  Peay's testimony supports the trial court's finding that Peay effectively resigned, through her words and conduct, as of January 19, 2020.[9]

As the trial court noted, Restriction No. 9 in the CC&Rs provides that the Architectural Committee cannot exceed three members, but it provides

---

[9]     The evidence in the record reflects that Peay no longer participated in the Architectural Committee's activities after January 19, 2020.

for no minimum number of members to comprise the Committee. The trial court did not abuse its discretion in concluding that the absence of a requirement of any minimum number of members in the CC&Rs permits the Architectural Committee to operate as a committee of one.[10] Thus, as the trial court concluded, at the time Le's plans were denied, the Architectural Committee consisted of Frontera, alone, and her decision on behalf of the Architectural Committee with respect to Le's plans was valid under the provisions of the CC&Rs.[11]

The trial court's determination that Peay effectively resigned from the Architectural Committee is supported by substantial evidence. Therefore, the court did not abuse its discretion in concluding that dissolution of the preliminary injunction was not warranted because Le failed to show that there was a material change in the facts upon which the court had granted the preliminary injunction.[12]

---

[10] On appeal, Le does not suggest that the Architectural Committee may not operate with only a single voting member.

[11] Although Le suggests that the CC&Rs require that some evidence of an Architectural Committee member's resignation be recorded or otherwise noticed to the homeowners in Corona Estates No. 2, there is no such requirement in the CC&Rs.

[12] The parties spend a portion of their briefing arguing about whether Le's proposed remodel would or would not conform to, or be in harmony with, similar structures in the community. As an alternative argument offered by the plaintiffs for affirming the trial court's order denying the motion to dissolve the preliminary injunction, the plaintiffs contend that even if the Committee was comprised of two members such that Frontera's decision not to approve Le's plans was invalid, the trial court's decision not to dissolve the injunction was nevertheless correct because where the Architectural Committee either does not exist or fails to act, a provision of the CC&Rs

C.   *The trial court did not abuse its discretion in its implied finding that dissolving the injunction would not serve the ends of justice*

In a brief separate argument, Le contends that the "trial court erred i[n] failing to conclude that the 'ends of justice' mandate the dissolution of the injunction" in light of the fact that Le has suffered additional damages as a result of the structure being exposed to the elements while this matter has been pending.  Le argues that this new damage constitutes "new facts and circumstances" that "should have, by themselves, been enough to end the injunction."  Le further maintains that Plaintiffs will not suffer any permanent "irreparable" damage if the injunction is dissolved because if they ultimately prevail, Le will be required to remove any obstructions.  Le also notes that Plaintiffs did not attend the Architectural Committee meeting where Le's plans were to be considered, suggesting that Plaintiffs' "did not even consider their interests in the alleged 'views' important enough."

We see no abuse of the trial court's discretion in its implied finding that the ends of justice did not require that the injunction be dissolved based on additional damage to Le's home from being exposed to the elements.  First, it is not clear that Le raised this argument in the trial court.  Further, the court required the plaintiffs to post an undertaking in the amount of $175,000, which they did.  Even if no undertaking had been required of the plaintiffs, we are not convinced that the court would have abused its discretion in determining that the ends of justice did not require that the preliminary

---

permits construction on the properties only if the construction "conform[s] to and [is] in harmony with similar structures" (boldface & underscore omitted) in Corona Estates No. 2.  Because we conclude that the trial court did not abuse its discretion in determining that there was no material change in the facts upon which the preliminary injunction was granted, we need not consider this alternative argument for affirming the court's order.

injunction be dissolved.  Le made the decision to move forward with construction on her home despite having been denied approval for that construction by the Architectural Committee.  The fact that her home is now subject to the elements as a result of being only partially finished is attributable to her decision to undertake self-help and proceed with construction without having obtained the approval of the Architectural Committee.  We therefore reject Le's contention that the court abused its discretion in not dissolving the injunction in view of additional damage that Le's home may be suffering due to the fact that it remains in a state of unfinished construction.

IV.

DISPOSITION

The trial court's order denying Le's motion to dissolve the preliminary injunction is affirmed.  The plaintiffs are entitled to costs on appeal.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

DO, J.

22